ELIZABETH RASH and others *vs.* MIRIAM PURNEL and others.

Our statute of wills requiring *two* witnesses to the execution of a will, such will must be *proved* by two witnesses.

And on an issue from the register of *devisavit vel non*, the party seeking to establish the will must examine *both* the attesting witnesses, if they can be had.

If the witness to a will deny his own attestation, the party calling him is not prohibited from contradicting or impeaching him.

Depositions taken before the register on a review, may be read on the trial of the issue, if the witness cannot attend.

Declarations of the testator as to his wishes and intentions are evidence.

The witness to a will need not see the testator sign; it is sufficient if he acknowledge the instrument, even where the name has been written by another at his request and in his presence.

Issue from the Register of wills of Kent county to try the question " whether the instrument of writing purporting to be the last will and testament of Joseph Rash, sen'r., is or is not the last will and testament of the said Joseph Rash, sen'r., deceased."

The will bore date 7th March, 1836, and was signed by the testator's *mark*, in the presence of Luke Lemar, William Pearson and James Brown. It was proved before the register on the 15th March, 1836, by Lemar and Pearson, two of the subscribing witnesses, whose depositions were regularly taken. Brown, the other witness, being interested, was not examined. Upon this probate, letters testamentary were granted to the executor named in the will.

In March, 1838, the defendants, who were heirs at law of the testator, petitioned for a *review ;* Lemar having in the mean time left the state ; and Pearson declaring, that from circumstances which had come to his knowledge since the probate, he did not believe the tes-

tator knew what he was about when he executed the will. A review was granted, and on the hearing of which, the register sent the issue to be tried in the Superior Court, and he ordered that the deposition of Luke Lemar, originally taken before the register, should be read in evidence.

*Comegys* and *Bayard,* for plaintiffs read the will and the depositions of Luke Lemar, having first accounted for his absence. They then offered to read the deposition of William Pearson, without calling him, which being objected to, they said they had closed their case.

*Bates* and *Frame,* for the defendants, expressed their surprise at this course; and, without going into any evidence on their part, moved the court now to instruct the jury that the will was not proved according to the requisitions of the statute of wills.

This motion was argued at length by the counsel on both sides, and

*The Court,* per J. M. CLAYTON, *Chief Justice,* delivered the following opinion by way of charge to the jury :—

The first matter to be considered in order to a proper understanding of this subject, is what is the object and effect of such an issue as this, and of the proceedings of this court upon it. The object of it is to inform the conscience of the register; to supply him with an unexceptionable verdict of twelve good men upon the facts, taken as other verdicts usually are under the direction of this court, as to all questions of law arising on the trial, and thus to enable him to form a correct judgment upon the whole matter in review before him. The proceeding is analogous to that issue and trial which in England are usually ordered by the Court of Chancery, when a bill is filed in that court by a devisee, to establish a will. *There,* the object of the issue and the trial is to inform the conscience of the chancellor, who thus obtains the verdict of a jury on the will, subject to the directions of the judge presiding at the trial, on the law. The effect of a verdict on such an issue here, as in England, is to supply proof to the court directing the issue; or to form a substitute for that trial or legal investigation, which would otherwise necessarily be had before that court. If the finding of the jury be in favor of the will, the register is justified in entering a decree accordingly upon it. And upon the trial of an appeal from the sentence of the register, establishing a will on the foundation of a verdict in favor of the devisees, after the trial of such an issue, this court exercising appellate jurisdiction would, in the absence of all other evidence, undoubtedly affirm the sentence of the court below.

It would seem to flow as an irresistible conclusion, from this sim-

ple view of the subject, that this court on the trial of such an issue, must demand the same measure of proof to substantiate the will, which the register by law must require on a trial before him. If this court should establish the principle, that the examination of a single testamentary witness, when there are others present and not examined, is sufficient to justify a jury in rendering a verdict declaring that the instrument in controversy is the last will and testament of the deceased, then the object of the register would be effectually defeated, and the effect of the finding of the jury would be destroyed, or the settled principle of law, as admitted by the counsel on both sides, which requires the examination of two subscribing witnesses, *in the presence of the register,* if within the jurisdiction of his court, before the register can allow probate of the will, would be virtually annulled ; for then the verdict of the jury establishing the will, would only inform him that it had been obtained on such testimony as this court allowed, and upon the return of the record and proceedings, he could never ascertain from any thing appearing in them, whether the verdict was found upon more than the testimony of a single witness. The effect of the finding would thus become nugatory, and the object of the law which authorizes the register to award such an issue, would be defeated.   Should he not be aware of the adoption of such a principle by this court, the finding of the jury would only mislead him ; and supposing him to be informed that this court had adopted such a principle, he could pay no respect to the verdict of the jury, for he never could safely regard it as the foundation upon which he could base a decree.   Twenty successive verdicts, each establishing the will, under as many different issues sent by him to this court, would not justify him in entering a decree in favor of the will ; for each verdict might be founded upon the uncorroborated evidence of one and the same witness, and he could not judicially know, that is, he could not know from any thing appearing upon the face of the record and proceedings of this court, when returned to him, that the fact had been otherwise.   Then too, of what avail would the issue and finding upon it be, when presented before the appellate court, which might or might not consist of the same judges who tried the issue.   Should they undertake to travel out of the record, and take cognizance of the fact that two subscribing witnesses had been examined on the trial of the issue, they might find that fact controverted by the parties, and so be called upon to try in appeal, matters not appearing by the record before them : should they confine themselves to the legal effect of the verdict on the issue, as appearing by the record alone, they could not affirm a decree of the register establishing

a will, bottomed on a verdict which they would know might have been obtained on the evidence of a single subscribing witness.

The question, whether the *register* can take probate of a will founded on the testimony of a single subscribing witness, is one which does not admit of a doubt. Our statute of wills of 23d January, 1829, in general varies from the English statute only in requiring two, instead of three credible testamentary witnesses. It provides "that every will and testament, whether of personal or real estate, must be in writing and signed by the testator, or by some person subscribing the testator's name, in his presence and by his express direction, and attested and subscribed in his presence, by two or more credible witnesses; or it shall be void." In the construction of the English statute, it has been considered as settled law, ever since the days of lord Talbot, that on a bill filed by the devisee to establish a will in chancery, all the subscribing witnesses are required by the English statute, if alive and within the jurisdiction of the court, to be examined, to authorize the entry of a decree for the will. It is sufficient to refer to the cases of *Townsend* vs. *Ives,* 1 *Wilson,* 216 ; *Ogle* vs. *Cook,* 1 *Ves. sen.* 177 ; *Grayson* vs. *Atkinson,* 2 *ib.* 459 ; *Bootle* vs. *Blundell,* 19 *Ves. jr.* 494 ; *Cowp.* 136 ; and the authorities generally, cited in the elementary books, as evidence how the law has stood and still stands upon this subject. The cases establish certain exceptions to the general rule, requiring the examination of all the subscribing witnesses, founded on the reason and necessity of each case. Thus, where a witness is rendered incompetent to give evidence by insanity, or from infamy of character, or interest arising after the execution of the will, or where he cannot be found after strict and diligent inquiry, his examination is dispensed with. But in general, the courts have exhibited great reluctance to relax the ancient rule, which was never to decree a will proved, unless all the witnesses were examined. An able writer on this subject, (*Powell on Devises,* 643,) says the reason of this rule is, that if after the decree, the heir were to controvert it, the court would order an injunction, and therefore, he has a right to proof of sanity from every one of those whom the statute of frauds has placed about his ancestor. The effect of a probate in chancery in England, is similar to that of a probate here before the register. After a trial on a caveat or a review, the sentence of each of these courts establishing a will is conclusive on the parties, until it is reversed or annulled by due course of law. The register is a judge, and the sentence of his court is the judgment of a tribunal of exclusive and peculiar jurisdiction on the subject matter before him, and therefore, it is conclusive on all the world, when it comes incidentally or collaterally in question on a trial at law. The course of pro-

ceeding to try the validity of a will in this state, is by filing a caveat or praying a review. But in England and some of the states, it has been a common practice to try the validity of a will by presenting it incidentally to a jury in ejectment. This is called, in the common language of the books, trying the will at common law; and in all cases where the will is thus presented for trial, the examination of a single subscribing witness to the instrument by the party claiming under it, is held to be sufficient in the first instance. In these cases, the law requires proof of a will by no more witnesses than is ordinarily required in a case where a deed is sought to be proved. The verdict and judgment in ejectment, whether for or against the will, is not conclusive, even upon the parties to the trial. If rendered in favor of the devisee, the heir at law is indeed dispossessed by a writ of habere facias possessionem ; but he may immediately renew the controversy by bringing an ejectment against the devisee, and the former recovery will be no bar to his action. But it is otherwise, where a will has been established by the sentence of a court of chancery in England, or by a probate before the register in Delaware, and it is because the sentence of these tribunals is conclusive on the parties, and of such effect as I have described against all others, that the law requires the observance of such different rules of evidence before that sentence can be obtained. In the case of *Bootle* vs. *Blundell*, 19 *Ves.* 494, it was held by lord Eldon, that the rule which requires the examination of all the witnesses, subject to the necessary exceptions before mentioned, extends to issues directed by the court " which being a proceeding under the immediate direction of, and for the express purpose of informing the conscience of the court, is governed by equitable principles; in which respect it differs from an ejectment directed by the court, where the legal rules of evidence obtain." We know of no case in the books, and surely none was produced in the argument at the bar, establishing a distinction between the number of witnesses required to be examined in case of a bill filed to set up or prove a will in chancery, and in case of an issue sent by chancery to a court of law, for the purpose of trying the validity of a will sought to be established in chancery. One or two cases have occurred, where less than the number of witnesses were examined on the trial of the issue at law, and where the heir at law does not appear to have taken the advantage of the defect in proof. Thus in *Bootle* vs. *Blundell*, he expressly *waived* the objection at the trial, and agreed that the cause was against him, and for this culpable neglect or wilful waiver of his rights, the chancellor refused him a new trial. The case of *Winchelsea* vs. *Wauchope*, reported in 3 *Russell*, 441, (3 *Con. Chan. Rep.*, 474, s. c.,) was indeed cited by the counsel for the

plaintiffs as an authority to show that on the trial of an issue at law, the omission to examine one of the subscribing witnesses to the will was not regarded as a circumstance upon which the master of the rolls would lay any stress upon a motion for a new trial ; but upon looking into that case we find that Mr. Dundas, the witness referred to, was not one of the subscribing witnesses to the will, but only the draughtsman of the will, and signed the testator's name by his direction ; and that the master of the rolls had only said that he laid no stress upon *his* absence. In that case, all the subscribing witnesses were examined.

In the progress of the argument, the counsel for the plaintiffs relied on the case of *Tatham* vs. *Wright,* reported in 2 *Russell & Mylne,* 1. In that case, where the bill was filed by the heir at law *to set aside* a will, and an issue had been directed by the chancellor, after the verdict, upon a motion for a new trial, lord chief justice Tindall and lord Lyndhurst refused the motion ; although on the trial of the issue before the jury, the devisees had examined but one subscribing witness, and tendered the other subscribing witnesses to the heir at law, who refused to examine them. Among the other reasons assigned by the court in this case for refusing the new trial, the palpable distinction between a bill to set aside a will, and a bill to establish it, was taken by these judges; and lord chancellor Brougham, to assist whom the chief justice and chief baron had given their opinions, observed " there is a broad line of distinction between cases where the moving party seeks to set the will aside, and cases where the moving party is a devisee, seeking to establish it ; the rule which makes it imperative to call all the witnesses to a will must be considered as applicable to the latter only." It is evident that the decision of the jury in this case on the issue, and the ultimate decision of the court on the bill filed, had no such binding or conclusive operation as follows in case of a bill filed to establish a will, and would follow here. The heir at law, in the case cited, could not be estopped or enjoined by any decision which the court could make in controverting the same will, whenever the devisee should seek to establish it ; and, therefore, as the proceeding resembled so far, and in this respect the ordinary mode of trying the will in an ejectment at law, the same rule of evidence was held applicable to both ; that is, the evidence of a single witness was held to be sufficient.

In this case of *Tatham* vs. *Wright,* it was observed by the chief justice that " it may be taken to be generally true, that in cases where the devisee files a bill to set up and establish the will, and an issue is directed by the court upon the question, *devisavit vel non,* this court will not decree the establishment of the will, unless the de-

visee has called all the subscribing witnesses to the will, or accounted for their absence. And there is good reason for such a general rule. For as a decree in support of the will is final and conclusive against the heir, against whom an injunction would be granted, if he should proceed to disturb the possession after the decree, it is but reasonable that he should have the opportunity of cross-examining all the witnesses to the will, before his right of trying the title of the devisee is taken from him. In that case, it is the devisee who asks the interference of this court, and he ought not to obtain it until he has given every opportunity to the heir at law to dispute the validity of the will. This is the ground upon which the practice is put in the cases of *Ogle* vs. *Cook*, 1 *Ves. sen.* 178, and *Townscend* vs. *Ives*, 1 *Wils.* 216. But it appears clearly from the whole of the reasoning of the lord chancellor in the case of *Bootle* vs. *Blundell*, 1 *Mer.* 193; *Cowper*, 136, that this rule, as a general rule, applies only to the case of a bill filed to establish the will, (*an establishing bill,* as lord Eldon calls it in one part of his judgment,) and an issue directed by the court upon that bill."

We have noted this part of the opinion for observation, not merely because it admits the distinction between a bill to establish, and a bill to set aside a will, (which distinction is also elsewhere strongly insisted upon as the chief basis of this decision,) but because it denies the right of either party to cross-examine a witness to the will, whom he may have examined in chief. If this be correct doctrine, then indeed were we to direct the jury to find for this instrument as the will of Joseph Rash on the evidence before us, we should thereby deny to the heirs at law all benefit of cross-examination of each and every witness to the will. They have had no opportunity to examine Lemar, for his deposition was strictly exparte, and he left the state before they contested the will. Had they called Pearson, the other subscribing witness, they could not have cross-examined him; because, by this doctrine he was their witness, and they could not contradict or impeach him. Their situation, however, would not have been so deplorable in that case. For we hold with lord Eldon, in the case cited of *Bootle* vs. *Blundell*, as reported in 19 *Vesey*, that they might have cross-examined him had he proved to be a witness against them; and we hold equally, that had the plaintiff called him and he had proved to be witness against him, that he also might have cross-examined him. It has been held in an ordinary case at nisi prius, that a witness who is called by a party and unexpectedly turns out to be a witness against him, may be cross-examined by that party; and although the general rule is not doubted, that a party cannot impeach or discredit his own witness, yet this rule is liable to many

exceptions, founded on the reason and necessity of the case, and its practical application depends much upon the sound discretion of the court, before which the effort is made, to impeach the witness.   A man is not 'necessarily to be ruined because he has summoned a witness to prove his case who turns out on the trial, to his astonishment, to be a villain.   And in will causes we think there is great good sense in the doc'rine of lord Eldon, which holds the instrumentary witnesses to be the witnesses of the court, and not of the party who calls them, so far as to authorize the strictest examination on both sides of an issue of *devisavit vel non,* for the party is compelled to call them, and therefore, if he could not cross-examine, it would often happen against the justice of the case, that the will would not be established.   We have said thus much on this point, because we desire that these and all other parties in future, may be apprised of their rights as they are understood by this court.

We pass over the remarks of Sir John Leach, the master of the rolls, on the motion for a new trial in this case of *Tatham* vs. *Wright,* and notice an observation of chief justice Tindall ; which notice may apply to the remarks of both.   The chief justice says : " It is obvious that if the devisee should be compelled on the trial of this issue to make those witnesses, (meaning the witnesses against him) his own, the effect would be to shut out instead of discovering the truth ; for after the formal examination to which alone they could be subjected, the heir at law would take care not to ask them a single question." 6 *Cond. Eng. Chan. Rep.* 374.   Without going further into the question at this time, we say we are well satisfied with the opinion of lord Eldon on this subject of examination, in the case of Bootle and Blundell, to which opinion the judges in this case resorted, for their principal authority to make out the very distinction on which they mainly relied, between a bill to establish and a bill to set aside a will. The apparent determination of the court in this case to repudiate the rule laid down by Eldon, that in will causes, either party may cross-examine the subscribing witnesses in a proper case, when the party calling the witness finds the witness is against him, has rendered it necessary for them to establish new rules of evidence unknown before to the courts, and to extend the exceptions to the old general rule, that where the proceeding is to establish the will, the devisee must call and examine all the witnesses beyond the established precedents or the apparent necessity of the case.

There are other reasons for distinguishing the case of *Tatham* vs. *Wright* from that before us, but we have now noticed it sufficiently.

We are for these reasons unanimously of opinion that in this case the plaintiffs have refused to produce sufficient witnesses to autho-

rize a jury to pronounce a verdict that the instrument before them is the last will and testament of Joseph Rash, deceased. It is true, that one witness has sworn to its execution, at least so far as he is concerned. But it might as well be contended on a trial for high treason, where two witnesses to the same overt act of treason are absolutely required by the constitution; or on a trial for perjury, where two witnesses are required by law, that the evidence of one is sufficient to justify a jury in finding a prisoner guilty, as it can here be contended that the evidence of one witness to a will is sufficient to establish it. In these cases the law regards the proof of one witness as utterly insufficient. Half the proof required by a law is, when unsupported by the other half, equivalent to no proof whatever.

We, therefore, do unanimously direct the jury to find a verdict against the will.

The Register afterwards directed another issue of devisavit vel non, and ordered that the deposition of Pearson should be read on the trial of that issue.

The trial came on at the April term, 1839, when, after reading Lemar's deposition, Pearson was called by the plaintiffs, and testified *against* the will. They then offered to read his deposition, taken on the probate of the will, with a view to contradict his present testimony; and the court admitted it in evidence.

The plaintiffs also offered the deposition of Mrs. Hester Ann Moore, taken on the application for a review, before the register; she having been summoned, and it being now proved by her physican that she was unable, through sickness, to attend. It was objected to, as not being taken in the cause.

*The Court.*—It was decided in the case of *Masten vs. Anderson,* that the deposition of a witness who proved the will, could be read in this court on the trial of an issue of devisavit vel non.

*Bates.*—This witness is not a witness to the will. Her testimony was not taken on the original probate, but on the petition of review. The deposition of an instrumentary witness is evidence ex necessitate; and is made evidence on the review by the act itself. *Digest,* 217.

*Court.*—If these parties had had a suit in chancery, depositions taken even about another matter, would be evidence between the same parties where the witness could not be procured. We don't confine ourselves to the act of assembly; though that confirms our view. The design of the act is to make the *proof* taken before the register, proof elsewhere, if the witnesses cannot be had. There is no distinction in the act between the deposition of the attesting wit-

ness and that of any other witness. Indeed, it is more important that the subscribing witness should be examined personally, than any other witness. This deposition was taken on full notice and opportunity of cross-examination by the defendants, who did actually cross-examine this witness.

Parts of the deposition were objected to as proving declarations of Joseph Rash, made before the making the will.

*Court.*—Here is an issue of devisavit vel non. The object is to ascertain whether the bequests in this paper were the true will and wish of the testator. For this purpose his affections and dislikes are important as showing intention, and for this purpose the conversations and declarations of the testator at any time are evidence. Their weight is another thing. That is for the jury. If made long ago, common sense will teach that they should have less effect in showing intention at the time of making the will. On the trial of Wilson Buckmaster's will, three previous wills were given in evidence as showing intention; and also numerous declarations and conversations of the testator at various times.

The plaintiffs then closed; and the defendants having offered some evidence with a view to impeach the veracity of Luke Lemar, also closed.

*Comegys* and *Bayard*, to the jury, contended that the will was sufficiently proved. A signing by making a mark is a good signing under our act of assembly; but even if this were a case of signing by substitution, all the requisites were proved.

*Bates* and *Frame*, for defendants, contended that Pearson's deposition was not evidence, except for the purpose of contradicting and impeaching his testimony delivered here orally. If then it did not impeach him, the execution of the will was not proved by two witnesses, for he does not swear to it; if it did impeach him, still the will was not proved by two credible witnesses, for the impeachment deprived him of credit.

*By the Court.*

J. M. CLAYTON, *Chief Justice,* to the jury :—

The first question for consideration is, whether the deposition of William Pearson is evidence in the cause generally, or only for the purpose of contradicting the testimony he has given here at the bar. In an ordinary trial at bar, it is admitted that such a paper would not be evidence, except for the purpose of discrediting the witness, as for instance, if Pearson had been sworn on the former trial of this cause, and the deposition then offered; but it is said that the case is now varied, because the register has made an order that the deposition

should be read on the trial of this issue. How are we to understand this? It was an order that it should be read for legal purposes. The register did not mean to make an order for the introduction of other than legal proof. The register knew that Pearson now contradicted his former deposition. He knew that Pearson was to be examined as a witness here; for he sent the issue a second time for that very purpose. On the former trial the plaintiffs refused to call Pearson, under the apprehension that they would not be allowed to impeach his testimony, even by reading his former deposition; and it is probable that the same apprehension induced the register to direct that the former statement of the witness as well as his present testimony should be laid before the jury, that they might be weighed together. Yet the deposition is not legal evidence for general purposes in the cause, and the register's order could not make it so. The deposition of Lemar is evidence ex necessitate; so made by the law; but evidence of an inferior grade, there being no opportunity of cross-examination; but yet it is evidence to be considered by the jury and weighed and scrutinized. In connection with this, the jury will take the evidence of Pearson; not his deposition, but his evidence, as corrected by his deposition. In both he states that he took the paper in his hand, called the testator's attention to it, and asked him if he wished him to sign it, and that Rash answered affirmatively. The question then is, did Rash then understand what he wrs doing, and what was the meaning of the answer. Did it amount to a recognition by him that it was his will, and a request that Pearson should sign it as a witness. If so, it was a good execution. If not, otherwise. If it was a request to the witness to sign it as a witness, it was in effect to attest that the testator signed, sealed and delivered the paper as his will, which are the words of the attestation here.

Where one witness alone proves the execution of a will, it is insufficient; the law requiring two witnesses. Each of the witnesses must have seen the testator sign the will; or have heard him, in form or substance, acknowledge it to be his will. Such acknowledgment is sufficient. The witnesses also, must sign in the presence of the testator; but this means only that they shall sign in the same room, and where the testator could see it if he choose; not that he did actually see the witnesses sign.

The signing might be either personally, by mark, or by another subscribing the testator's name at his request and in his presence. As the execution may be proved by an acknowledgment of signature, where the signing is by the testator; so where the name is written by another, proof of an acknowledgment may be sufficient, but; it ought to be plenary and conclusive, not only as to the fact of ac-

knowledgment, but also that the name was subscribed in the testator's presence and by his express direction.

Verdict for the will.